Stanford v. Lyon.

## WILLIAM H. STANFORD

*v.*

## ANN LYON and WILLIAM LYON.

1. As a general rule, an injunction will not be granted until the complainant's legal right has been established at law, yet in a case where his right appears to be clear, though it has not been established at law, and the defendant denies it, and the complainant has, for a long time, been in the enjoyment of the right, and the acts of the defendant, in violation of it, are recent, a court of equity may properly take jurisdiction of the question of legal right, and decide that as well as the other questions involved in the litigation.

2. A party asking to have a nuisance abated by injunction, will be entitled to relief by that process whenever he can clearly demonstrate two facts: *first,* that the injury of which he complains is such, in its nature and extent, as to call for the interposition of a court of equity; and, *second,* that the right on which he grounds his title to relief is clear, whether that fact has been made plain by the action of the appropriate tribunals for the adjudication of questions of legal right, or is so by the settled law of the state, when applied to the facts of his particular case.

3. A mandatory injunction is awarded as of course, whenever it is the necessary and appropriate process for carrying the decree of the court into effect.

4. A court of equity will not take jurisdiction of a question of damages, pure and simple.

5. A party who, by the obscurity or ambiguity of his inquiry, leads another to make an erroneous statement respecting his rights, or by his artful silence entraps another into an admission he would not have made if a fair opportunity had been given to him to declare the truth, is in no position to claim the benefit of an equitable estoppel.

On final hearing on original bill and answer, and supplemental bill and answer, and proofs taken in open court.

*Mr. Ludlow McCarter* and *Mr. Barker Gummere,* for complainant.

*Mr. Thomas N. McCarter,* for defendants.

Stanford v. Lyon.

## Van Fleet, V. C.

The principal object of this suit is to remove and abate a nuisance. The premises in controversy are situate on the southeast corner of Mulberry and Elm streets, in the city of Newark. They were originally owned by Dr. Luther G. Thomas. He died on the 1st day of May, 1864, leaving a will, bearing date March 13th, 1863. By his will the *locus in quo* was devised as follows :

"*First.* I give, devise and bequeath all my real estate, wheresoever situated, of which I may die seized or possessed, to my brother, Lemuel Thomas, and his heirs and assigns forever; upon conditions, nevertheless, that he shall permit William H. Stanford to carry on the business of a druggist in that part of the premises situated on the southeasterly corner of Elm and Mulberry streets, now occupied by him, as long as he shall desire to use it for that purpose, at an annual rent not to exceed $100; I make this condition solely in favor of said Stanford, and do not intend it to extend to his representatives or assigns."

At the time of the death of Dr. Thomas, the premises so devised consisted of a lot and building; that part of the building fronting on Mulberry street was used as a drug store, and the

Note.—In *Martyr* v. *Lawrence, 3 De G. J. & S. 261,* the plaintiff was tenant of a one-storied shop, having over it a flat, leaden roof. The defendant was tenant of a cottage abutting on the shop, and having a window opening on the roof of the shop. Both buildings had long been held under the same landlord. In 1849, the shop was demised to one Corke, the landlord to have the exclusive use and enjoyment of the leaden roof, and to cover the same with earth for a lawn or flower garden, or for any other use or purpose not injurious to Corke. In 1861, the shop was demised to the plaintiff, " *as the same was late in the occupation of Henry Corke, together with the appurtenances thereto belonging.*" In 1863, the defendant rented the cottage, with the right to use the leaden roof to erect a light building thereon to be used by defendant as a photographer, and defendant did so erect and use it.—*Held,* that the above italicised words in the plaintiff's lease were only intended to identify the premises and not to restrict their use, and that consequently plaintiff was entitled to have the building removed from the leaden roof.

In *Berkeley* v. *Smith, 27 Gratt. 892,* a decedent was the owner of two lots, one on the corner of the street, which was wholly occupied by a store extending back the full depth of the lot, seventy feet, and the other occupied by a store extending back only fifty-five feet, leaving in the rear of the latter store a lot twelve by twenty feet, which was unoccupied except by a privy. The

rear as a dwelling. In the rear of the drug store there was an open yard, containing a hydrant, a privy, a cesspool and considerable room for storage. Access to the yard, from the drug store, was had through a door in the rear of the store; the yard could also be entered through a gate on Elm street, and there were doors in the dwelling leading into the yard. When the will was made, and also when Dr. Thomas died, the complainant and the doctor were engaged, as copartners, in carrying on the business of druggists in the store. The agreement of copartnership between them took effect September 1st, 1862, but was not reduced to writing and signed until April 13th, 1864. It contains the following stipulation :

"It is also further understood and agreed that the building where the business has heretofore been carried on, and where it is still to be carried on by the new firm now formed, shall still remain the individual property of the said Luther G. Thomas, and that for the use and rent of the store, cellar and office, used in the said business, the new firm shall pay to him the sum of $100 per annum."

The complainant alleges that at the time the agreement of copartnership was made, the premises used and occupied by Dr. Thomas, for the purposes of his business as a druggist, and which

first lot was devised to decedent's son J., *together with the east side: or half of the privy,* and the second lot to another son, W. Afterwards W. sold his lot to B., *subject to the rights of the owner of the first lot to the east half of the privy.* After S.'s death, and during the minority of his heirs-at-law, B., while occupying S.'s store as a tenant, removed the privy, blocked up the door in S.'s store opening into the space in the rear of B.'s lot, through which S.'s heirs had access to the privy and also light and air, and also extended the first story of his own storehouse to the rear line of his lot so as to cover the entire space, and covered the extension with a flat roof, upon which he erected another privy accessible from the second stories of both store-houses over the flat roof, and for that purpose cut a door in the second story of the west wall of S.'s store-house. Two actions at law were brought by S.'s heirs against B., and damages of one cent and costs recovered by them in each action. A mandatory injunction to remove the extension was then obtained. The court of appeals, however, citing *Isenberg* v. *East India House Estate Co., 10 Jur. (N. S.) 221,* held that, although the rights and privileges of S.'s heirs had been seriously invaded, yet the extent of the injury was capable of ascertainment and pecuniary compensation, and the inconvenience to S.'s heirs, in the premises, insignificant compared with B.'s should he be required to remove the extension, and therefore the

Stanford *v.* Lyon.

it was agreed and understood the copartnership should have the right to use, for the purposes of the business to be carried on by them, embraced the right to use the hydrant, the privy and the cesspool, together with a passage, from the rear of the store, through the yard, to them, the right to take merchandise to and from the rear of the store through the gate on Elm street, and the right to use the yard for unpacking merchandise, washing bottles and other vessels, and for the storage of empty boxes, barrels and other articles of like character; and that all these rights, from the time the agreement of copartnership was made, up to the time of Dr. Thomas's death, were exercised and enjoyed by the firm, freely, without disturbance or question.

The defendant Ann Lyon succeeded, by conveyance, to the title devised to Lemuel Thomas. The deed to her bears date May 1st, 1866, and expressly declares that the premises are conveyed subject to the right and interest of the complainant therein. That part of the building used as a dwelling was never occupied by Dr. Thomas himself, but was let by him to tenants. Up to the letting for the year commencing April 1st, 1862, the proof renders it entirely clear that Dr. Thomas uniformily reserved, for

decree of the chancellor ordering a mandatory injunction was reversed, and an inquiry as to the damages sustained by S.'s heirs was directed.

That an injury sought to be restrained has been completed before the filing of the bill, does not prevent the court from granting a mandatory injunction to remove it, *Durell* v. *Pritchard, 11 Jur.* (*N. S.*) *576, L. R.* (*2 Ch.*) *244; Rankin* v. *Huskisson, 4 Sim. 13; City of London Co.* v. *Tennant, L. R.* (*9 Ch. App.*) *212, 219; Rogers Loco. Works* v. *Erie R. R. Co., 5 C. E. Gr. 389;* see *Martin* v. *Headon, L. R.* (*2 Eq.*) *425; Curriers Co.* v. *Corbett, 11 Jur.* (*N. S.*) *719; Atty.-Gen.* v. *N. J. R. R. Co., 2 Gr. Ch. 136; Bell* v. *Blount, 4 Hawks 384; Atty.-Gen.* v. *Heishon, 3 C. E. Gr. 410; Washington University* v. *Green, 1 Md. Ch. 97; Stanley* v. *Shrewsbury, L. R.* (*19 Eq.*) *616.*

Where the inconvenience of removing the obstacle is great, the court will allow a reasonable time for the defendant to remove it, *Atty.-Gen* v. *Colney Hatch Asylum, 19 L. T.* (*N. S.*) *708, L. R.* (*4 Ch.*) *146.* See *McKelway* v. *Armour, 2 Stock. 115, 118.*

That the public may be put to inconvenience, is no ground for refusing such writ, *Raphael* v. *Thames Valley R. R. Co., L. R.* (*2 Ch.*) *147; Atty.-Gen.* v. *Chicago R. R. Co., 35 Wis. 425;* see *Atlanta* v. *Ga. R. R. Co., 40 Ga. 471; Hicks* v. *Dorn, 42 N. Y. 47; Eason* v. *Perkins, 2 Dev. Eq. 38; Bradsher* v. *Lea, 3 Ired. Eq. 301; Dilworth's Appeal, 91 Pa. St. 247.*

Stanford v. Lyon.

the occupants of the drug store, to be exercised in common with the occupants of the dwelling, the right to use the privy, the hydrant, the cesspool and the gate on Elm street. He also reserved the right to store empty boxes and other bulky articles of like character in the yard. David Collins became tenant of the dwelling on the 1st of April, 1862, and remained in possession, under Dr. Thomas and those who succeeded to his title, until April 1st, 1867, when the defendants entered. The defendants claim that by the terms of this last demise, Mr. Collins acquired an exclusive right to the whole yard, except a space of ten feet square, adjacent to and immediately in the rear of the drug store, and that whatever rights the complainant subsequently exercised therein, or whatever uses he thereafter made of it, were permissive only, and not of right. But the proofs show very clearly, notwithstanding this claim, that from the commencement of Mr. Collins's term up to November, 1870, the occupants of the drug store used the privy, the hydrant, the cesspool and the Elm street gate, freely, whenever they desired to do so, and without interruption or question. They also, during the same period, used the

Only so much of the erection as causes the obstruction should be removed, *Wood on Nuisances* §§ 814, 834–836.

Where the *use* of the building constitutes the nuisance, the building itself cannot be demolished, *Brightman* v. *Bristol*, 65 *Me.* 426 ; *Barclay* v. *Com.* 25 *Pa. St.* 503 ; *Welch* v. *Stowell*, 2 *Doug.* (*Mich.*) 332 ; *Moody* v. *Supervisors*, 46 *Barb.* 659 ; *Gray* v. *Ayres*, 7 *Dana* 375 ; *Ely* v. *Supervisors*, 36 *N. Y.* 297 ; *Brown* v. *Perkins*, 12 *Gray* 89 ; *State* v. *Paul*, 5 *R. I* 185 ; *Miller* v. *Burch*, 32 *Tex.* 208 ; *Chenango Bridge* v. *Paige*, 83 *N. Y.* 178 ; *Metropolitan District* v. *Hill*, *L. R.* (6 *App. Cas.*) 193 ; see *Hamilton* v. *Whitridge*, 11 *Md.* 128 ; *Haag* v. *Vanderburgh Co.*, 60 *Ind.* 511.

An apprehended noxious use of a building is not sufficient to justify its removal, *Atty.-Gen.* v. *Paterson*, 1 *Stock.* 624 ; *Dumesnil* v. *Dupont*, 18 *B. Mon.* 800 ; *Rhodes* v. *Dunbar*, 57 *Pa. St.* 274 ; *Ellison* v. *Comrs.*, 5 *Jones Eq.* 57 ; *Baines* v. *Baker*, *Ambler* 159, 3 *Atk.* 750 ; see *Hepburn* v. *Lordan*, 2 *H. & M.* 345 ; *Cleveland* v. *Citizens Gas Light Co.*, 5 *C. E. Gr.* 201.

Mandatory injunctions have been allowed—to compel a railroad company to pull down walls which they had built in order to prevent another railroad company's track from crossing their line, *North of England R. R. Co.* v. *Clarence R. R. Co.*, 1 *Coll.* 507 ; *Deere* v. *Guest*, 1 *M. & C. 516* ; to enforce a building covenant as to projections into the street, *Child* v. *Douglass*, *Kay* 560,

Stanford v. Lyon.

yard, to greater or less extent, for many other purposes, including the storage of empty boxes.

In October, 1870, the defendants began to make preparation to erect a building across the whole of the lot not already covered by the dwelling. On the complainant's attention being called to what the defendants were about to do, he protested against the erection, insisting that it would deprive him of his rights in the yard. The defendant William Lyon says that he told the complainant he did not think he had any rights in the yard, but he admits that at the same time he said to him, that if the building did injure him, he would do what was possible to remedy the injury. He says that " we" (meaning the complainant and himself) " entered into a plan as to what would be a remedy," and he states what the plan was, and then says, " I agreed, as I stated before, that any damage that the new building should cause, I would do what could be done to remedy the difficulty." The complainant subsequently procured a written agreement to be drawn, conforming substantially with the plan agreed upon, but because it gave the occupants of the drug store the exclusive use of the privy, which was to be provided in the place of the old

---

5 De G. M. & G. 739 ; Linzee v. Mixer, 101 Mass. 512 ; Kirkpatrick v. Peshine, 9 C. E. Gr. 206 ; Gawtry v. Leland, 4 Stew. Eq. 385 ; Manners v. Johnson, L. R. (1 Ch. Div.) 673 ; see Riddle v. Ash, 2 Ashm. 211 ; to pull down a wall or building that obstructed ancient lights, East India Co. v. Vincent, 2 Atk. 83 ; Jessel v. Chaplin, 2 Jur. (N. S.) 931, 37 E. L. & Eq. 472 ; Gale v. Abbott, 8 Jur. (N. S.) 987 ; Dent v. Auction Mart Co., L. R. (2 Eq.) 255 ; Smith v. Smith, L. R. (20 Eq.) 500 ; Athey v. McHenry, 6 B. Mon. 50 ; to compel the removal of tiles that obstructed the passage of smoke from a chimney, Hervey v. Smith, 1 K. & J. 389, 22 Beav. 299 ; to remove a building erected over a passage-way, Krehel v. Burrell, L. R. (7 Ch. Div.) 551, (11 Ch. Div.) 146 ; Schwoerer v. Boylston Market, 99 Mass. 285 ; Tucker v. Howard, 128 Mass. 361 ; see Mitchell v. Seipel, 53 Md. 251 ; Lexington Bank v. Guynn, 6 Bush 486 ; Kean v. Asch, 12 C. E. Gr. 57 ; to remove a mill-dam, Bemis v. Upham, 13 Pick. 169 ; Hammond v. Fuller, 1 Paige 197 ; Raleigh v. Hunter, 1 Dev. Eq. 12 ; Hahn v. Thornberry, 7 Bush 403 ; see Wheeler v. Steele, 50 Ga. 34 ; Yolo Co. v. Sacramento, 36 Cal. 193 ; to remove a building erected in violation of a covenant in a deed, Clark v. Martin, 39 Pa. St. 289 ; Tate v. Devlin, 3 Irish Jur. (N. S.) 341 ; to compel a defendant to alter stairs already built, so as to conform to his contract, Gregory v. Ingwersen, 5 Stew. Eq. 199 ; Pettis v. Johnson, 56 Ind. 139 ; to remove fences illegally obstructing a passage-way, Shivers v. Shivers, 5 Stew.

Stanford v. Lyon.

one, the defendants refused to sign it, and afterwards, although the complainant offered to have the agreement changed so that it should conform to the wishes of the defendants, in the respect indicated, the defendant William Lyon notified the complainant that the defendants would make no agreement with him. The defendants then proceeded with the erection of their building, and the complainant at once applied to this court for an injunction. An injunction was granted November 8th, 1870, prohibiting the erection. Subsequently, on the coming in of the defendant's answer, denying that the complainant had any legal right to the easements he claimed in the yard, the injunction was dissolved, the chancellor being of opinion that the case was controlled by the decision in *Fetters* v. *Humphreys, 4 C. E. Gr. 471;* but he also said that if *Fetters* v. *Humphreys* was not a controlling decision, still, as the rights claimed by the complainant had not been settled at law, or settled in his favor by any determination of a court of law in this state upon a like devise, he was not entitled to hold the injunction. *Stanford* v. *Lyon, 7 C. E. Gr. 33.*

The injunction being removed, the defendants completed the

*Eq. 478, 8 Id. 562; McDonogh* v. *Calloway, 6 Rob. (La.) 442; Langsdale* v. *Bonton, 12 Ind. 467;* see *Houck* v. *Wachter, 34 Md. 265;* or a toll-gate in a highway, *Columbus* v. *Rodgers, 10 Ala. 37; State* v. *Flannagan, 67 Ind. 140;* to remove water-pipes laid in a highway without the consent of the owner of the fee, *Goodson* v. *Richardson, L. R. (9 Ch. App.) 221.* See *Johnston* v. *Hyde 5 Stew. Eq. 446, 6 Id. 632.*

Mandatory injunctions have been refused, where the excess in building was trifling and the injury not irreparable, *The Warden &c.* v. *Southeastern R. R. Co., 9 Hare 489;* '*Manko* v. *Chambersburg, 10 C. E. Gr. 168.* Where, notwithstanding defendant's rebuilding, the plaintiff is in as favorable a position as before, *Low* v. *Inness, 10 Jur. (N. S.) 1037; Wilson* v. *Cohen, Rice's Eq. 80.* See *Shiras* v. *Olinger, 50 Iowa 571.* Where a party-wall projected, unintentionally, a few inches beyond the line, *Mayer's Appeal, 73 Pa. St. 164; Guttenberger* v. *Woods, 51 Cal. 523.* Where an adjoining land-owner inserted the joists of his building into plaintiff's building illegally, *Rankin* v. *Charless, 19 Mo. 490; Roberts* v. *White, 2 Robt. (N. Y.) 425.* Where a wharf, on tidewater, did not cause a public nuisance, *People* v. *Davidson, 30 Cal. 379; Larson* v. *Furlong, 50 Wis. 681.* See *Gawtry* v. *Leland, 4 Stew. Eq. 385.* To remove an ice-house erected in front of a riparian owner, *Alden* v. *Pinney, 12*

Stanford v. Lyon.

construction of their building. The complainant then brought an action at law against William Lyon alone, to test the question whether the erection of the building was an invasion of his rights. On the first trial of this action the complainant was non-suited, because the evidence by which he sought to maintain his rights, was held to be inadmissible. The judgment pronounced under that view of the law, was afterwards reversed by the court of errors and appeals (*Stanford* v. *Lyon, 8 Vr. 426*), and the action was then tried again, and on such second trial the complainant had a verdict, on which judgment final was entered, after the complainant's right to it had been contested, before the supreme court, on rule to show cause why it should not be set aside. The complainant has since then filed a supplemental bill, in which he prays that the building, which entirely excludes him from certain parts of the yard, may be removed and abated ; that the damages which he has sustained, in consequence of the erection of the builidng, may be ascertained, in such manner as this court may direct, and the amount be decreed to be paid to him, and that the defendants may be perpetually enjoined from interrupting or disturbing him in the use and enjoyment of his rights in the yard. The issues to be decided are those presented by the original and supplemental pleadings.

The law of the case is definitely and authoritatively settled. The devise to the complainant has been construed by the court of errors and appeals. In the case already mentioned (*Stanford* v. *Lyon, 8 Vr. 428*), the court said : " The will, in effect, gives the fee to Lemuel Thomas, subject to a life estate in Stanford, to carry on the business of a druggist in that part of the premises occupied by him. The intention of the testator mani-

---

*Fla. 348.* See *Clark* v. *St. Clair Ice Co., 24 Mich. 508.* To remove a wooden building erected within the " fire limits " of a city, *Dunning* v. *Aurora, 40 Ill. 481; St. Johns* v. *McFarlan, 33 Mich. 72.* To remove a business sign erected by defendant, and containing the same words as complainant's sign on the adjoining store, *Gray* v. *Koch, 2 Brown (Mich.) 119.*

If a building be illegally removed or destroyed, the parties injured may enforce its restoration, *Morrison* v. *Marquardt, 24 Iowa 35.* See *Bradford* v. *Cressey, 45 Me. 9 ; Meyers* v. *Smith, 15 Grant's Ch. 616.*—Rep.

festly was to continue Stanford in the possession of the part devised to him, with all the rights he held under the lease during the partnership.  *  *  *  *  *  That part of the premises devised to Stanford is co-extensive with that which he of right had held and occupied under and by virtue of any valid agreement with the testator." The court further held that the only means by which it could be ascertained what parts of the premises were used and occupied by Stanford, by right, was by resort to extrinsic evidence, and that it was competent for him to show, either by conversations with Dr. Thomas, or by Dr. Thomas's declarations, what was comprehended in the descriptive words of the partnership agreement.

This decision clears away all doubts respecting the complainant's legal rights, and marks out, with precision, just what he is entitled to under the devise. If this decision had preceded the motion to dissolve the injunction granted by Chancellor Zabriskie, it is manifest that the injunction would not have been dissolved. The complainant's legal right has been settled at law, not, it is true, in an action against the person holding the legal title to the premises in controversy, but that is not indispensable, as I understand the principle on which courts of equity proceed in such cases, to his right to an injunction, if his case, in other respects, is such as to entitle him to relief in that form. Now while it is true, as a general rule, that an injunction will not be granted in this class of cases, unless the complainant's legal right has been first established at law, or is so clear as to be free from reasonable doubt, yet it is also true that in cases where it appears the complainant's legal right is clear, though the defendant denies it, and it has never been established at law, but the complainant has, for a long time, been in the enjoyment of the right on which his bill is founded, and the acts of the defendant, in violation of such right, are recent, a court of equity may properly assume jurisdiction of the question of legal right and decide that as well as the other questions involved in the litigation. Chancellor Green, in *Holsman* v. *Boiling Spring Bleaching Co.,* *1 McCart. 335, 343,* said: " To entitle the party to the remedy by

injunction in cases of private nuisance, the right must be clear, and the injury must be such as from its nature is not susceptible of being adequately compensated for by damages, or such as from its long continuance may occasion a constantly recurring grievance, which cannot be prevented otherwise than by injunction."

The principle on which courts of equity proceed in such cases was defined by Chancellor Pennington in *Shields* v. *Arndt, 3 Gr. Ch. 234,* and his formula has since been adopted by the court of errors and appeals, in *Carlisle* v. *Cooper, 6 C. E. Gr. 576, 580.* Chancellor Pennington said: "It was not so much against the general jurisdiction of the court that the objection is raised, as to its exercise when the defendant, as in this case, denies the complainant's right. It is the province of this court, as the defendant's counsel insists, not to try this right, that belonging alone to a court of law, but to grant the possession whenever that right has been ascertained and settled. If it be intended to say that a defendant setting up this right by his answer, thereby, at once, ousts this court of jurisdiction, I cannot assent to it, for it would put an end very much to the exercise of an important branch of the power of this court. * * * * * If it be intended to go no further than that it is a question which should be sent to law in cases of doubt, and often should, before injunction, be first there established by trial and judgment, then I agree to the proposition. A long enjoyment by a party of a right, will entitle him to restrain a private nuisance, even though the defendant may deny the right, and the court will exercise its discretion whether to order a trial at law or not, always inclining to put the case to a jury if there be reasonable doubt." These citations show that the rule in force in this state does not require the party seeking relief by injunction, in such cases as this, in the first instance, in every case, to resort to a court of law for the establishment of his right, but that he will be entitled to relief by injunction whenever he can clearly demonstrate two facts: First, that the injury of which he complains is such, in its nature and extent, as to call for the interposition of a court of equity. Second, that the right on which he grounds his title to

relief is clear, whether that fact is made plain by the action of
the appropriate tribunals for the adjudication of questions of
legal right, or by the settled law of the state when applied to
the facts of his particular case. The defendant Ann Lyon is
not concluded by the recovery against her husband, but the law
as declared by the court of errors and appeals in that case, in
determining and defining what passed by the devise under con-
sideration, must be taken as the standard by which the rights of
the complainant in this case must be measured against her.

This brings us to the principal question of fact in the case:
What rights did the complainant acquire by his contract with
Dr. Thomas in that part of the premises of which the firm did
not have exclusive · possession ? Prior to the letting to David
Collins, there can be no doubt, under the evidence, that Dr.
Thomas, in his contracts with all his lessees, reserved the rights
now claimed by the complainant. The evidence renders it
almost equally clear, that during Mr. Collins's tenancy, and af-
terwards, up to October, 1870, the complainant exercised, as fre-
quently and as extensively as his business and convenience re-
quired, and in such manner as to indicate that he did it under a
claim of right, the rights he now claims. The complainant testi-
fies that in his contract with Dr. Thomas it was expressly stipu-
lated that the occupants of the drug store should have the use of
the yard, in common with the tenants of the other part of the
property, and the gentleman who drew the agreement of copart-
nership swears that when Dr. Thomas gave him instructions for
the agreement, he stated that he wished to rent to the firm the
same part of the premises which he had always occupied himself
in carrying on the business, and the same privileges which he had
always used when conducting the business as an individual. The
complainant had been in the service of Dr. Thomas, in his drug
store, from his boyhood, and he says it had long been understood
that when he attained his majority the doctor would give him an
interest in the business. When the previous relations of the
parties to the partnership agreement, and the object they had in
view in associating themselves together, are considered, the cir-
cumstances of the case of themselves, in the absence of all direct

proof, would afford strong presumptive evidence that it was mutually understood that the firm should have and enjoy all the facilities and conveniences for carrying on their business which the doctor had exercised and enjoyed when carrying the business on alone.   The facts of themselves, independent of any direct proof, render it almost absolutely certain that such was the understanding of the parties.   The evidence in support of the agreement claimed by the complainant is not only uncontradicted, but the agreement is one which, under the circumstances of the case, we must believe existed, in the absence of proof to the contrary.

But the defendants say, even if it be admitted that Dr. Thomas made a contract with the complainant, of the nature and extent claimed by him, it cannot avail him in this controversy, because Dr. Thomas had, by a prior contract, demised to Mr. Collins the exclusive use of the yard, except ten feet square, immediately in the rear of the store.   Mr. Collins swears that such a contract was made.   He says :

"It was especially agreed upon that I was to have the exclusive use of the yard; I was to have the exclusive use of the privy—that was mentioned."

On the trial before the Essex circuit court, in April, 1876, nearly three years before the testimony just quoted was given, Mr. Collins testified that he did not think there was any conversation between the doctor and himself, when he rented, on the subject of the privy.   Now he says it was distinctly agreed that his right to the use of the privy should be exclusive, and he gives a reason why he insisted on this stipulation.   His two statements stand in strong conflict; the difference between them is almost as decisive as the difference between yes and no, and while he may be an honest witness, it is quite obvious that it would be extremely dangerous to trust to the accuracy of his memory in any instance where his conduct, at an antecedent period, furnishes very strong evidence that he did not understand his rights then as he now thinks he recollects them.

Mr. Collins also swears that he rented the office—this is demised in express terms to the firm—but he admits that he never had possession of it.   His original contract was for a single year,

Stanford v. Lyon.

no subsequent express contract was made, but he continued to occupy under the terms of the original contract. He also admits that the occupants of the drug store were using the yard and privy when he took possession, and continued to do so during the whole period of his occupancy. He also states, as the reason why he insisted on having the exclusive use of the privy, that he expected his sister-in-law to occupy the house with him; that she was a dress-maker, and usually had several young women in her employ, and that it was therefore extremely desirable, both for privacy and convenience, that his family should have the exclusive use of that part of the premises. Now, although he claims to have rented the office and to have contracted for the exclusive use of the yard and privy, he admits that he never had either, and that he never asked for a reduction in his rent because he had not had all that he was entitled to for the rent he had agreed to pay, but what, I think, is still more remarkable, he admits that when he was about to enter upon a new yearly term, after the expiration of the first year, he did not call his landlord's attention to the fact that he had not kept his contract in the past, nor warn him that he would be required to keep it in the future, nor did he, at any time, notify the persons who were daily invading his privacy, and exercising an offensive privilege in his premises, that they were doing so without right and must desist in the future. He says he suffered himself to be deprived of the office and the exclusive use of the yard, because " he did not want to kick up a fuss." But how did he know that a simple demand of his rights would create a " fuss?" He had never attempted to secure their recognition by demanding them, nor by remonstrating against their violation, but day after day suffered himself to be deprived of them without complaint or resistance. His conduct furnishes strong evidence that he knew he had no right to them. He acted just as he would if that had been the case. His excuse for not insisting upon his rights cannot be accepted as either true or plausible. The average man does not, ordinarily, submit uncomplainingly to an invasion of his privacy, in a matter where he has taken special pains to secure, by clear and definite contract, his right to an exclusive enjoyment, simply

Stanford *v.* Lyon.

because a vague fear enters his mind that if he insists upon his rights disputes may arise. He had no reason to fear a "fuss;" there was, as he says, a clear understanding that his enjoyment should be exclusive; nothing had occurred which would justify even a suspicion that Dr. Thomas did not intend to observe his contract; when, therefore, he found third persons were disregarding his rights, his natural course was to command them to desist, but until his rights were asserted and his claims resisted, he was absolutely without cause for believing that simply demanding what he was entitled to would "kick up a fuss." It is impossible to reconcile his conduct with his claim; one or the other is untrue, and, in my judgment, it will be much the safest, after the lapse of so many years, during which it is certain many things must have been forgotten, or have become so faded as to rest in the memory as vague and indistinct impressions rather than certain, definite recollections, to accept his conduct as affording surer evidence of the truth than his memory.

The rightfulness of the complainant's claim, and also the truthfulness of his evidence, are strongly supported by Mr. Collins's conduct. The proofs show, beyond all doubt, an actual user by the complainant, apparently of right, certainly without permission, during the whole period of Mr. Collins's tenancy, of all the rights he now claims in the yard. His use was open and continuous; Mr. Collins knew of it, he does not pretend that he ever notified the complainant that his use of it was wrongful, or in violation of his rights. He says he thinks on one occasion, early in his tenancy, he remonstrated with the complainant about the privy *being too freely used,* but he cannot remember what the complainant said in reply, nor whether the complainant then claimed a right to use the privy and also to use the yard, but he does not pretend that at that time, or at any other, he set up an exclusive right to the privy or to the yard. He does not say, or swear, that he ever made such claim to either the complainant or to Dr. Thomas; on the contrary, by his conduct, in allowing the occupants of the drug store to use the privy daily, and the yard whenever they desired, he was saying to the complainant, as strongly as he could speak by failing to assert

his rights when they were invaded, that he had no exclusive right in the yard, and that the complainant's use of it was rightful. His conduct was perfectly consistent with the right asserted and exercised by the complainant, but utterly inconsistent with the exclusive right which he now asserts he then held.

If the decision of the case made it necessary, it might be important to inquire whether, even if it were conceded, that by the contract between Dr. Thomas and Mr. Collins, the latter acquired, as against Dr. Thomas, an exclusive right to the yard and privy, that fact would help the defendants in this litigation. They are not here in the right of Mr. Collins, but of Lemuel Thomas. They do not claim under Mr. Collins, but under Lemuel Thomas. Both parties claim as devisees under Dr. Thomas, and the important question is, What rights did each take by force of his will? The devise to the complainant is the primary one. He was to be permitted to carry on the business of a druggist in that part of the premises occupied by him, and the extent of the premises so devised has been defined to be, a possession and user co-extensive with the possession and user which he of right had held and occupied under and by virtue of any valid agreement with Dr. Thomas. Mr. Justice Van Syckel, in defining the complainant's rights under the devise, says: " The intention of the testator manifestly was to continue Stanford in the possession of the part devised to him, with all the rights he held under the lease during the partnership." The estate given to Lemuel Thomas is subject to the rights or estate first carved out and given to the complainant. As already remarked, there can be no doubt, under the evidence, that by the contract between Dr. Thomas and the complainant, the complainant was entitled, as against Dr. Thomas, to the rights he now claims; and it is equally clear, under the evidence, that up to the time his rights, as devisee, attached, his actual user of the premises was in strict accordance with the terms of his contract, and as broad and as full as its terms permitted. The question being one that must be decided by the intention of the testator, and the testator having declared that the complainant should take, under his will, just what he was entitled to under his con-

tract, the contract must, it would seem, be taken as the standard by which the complainant's rights, as against another devisee, who only takes after the complainant gets what he is entitled to, are to be measured, regardless of the fact whether the complainant's contract is valid or invalid against some third person.

My conclusion is, that it is established as a fact that by the contract between Dr. Thomas and the complainant, the complainant acquired a right to the use of the hydrant, the privy and the cesspool, together with a right of passage, from the rear of the store, through the yard, to them; the right to take merchandise to and from the rear of the store through the gate on Elm street, and the right to use the yard for unpacking merchandise, washing bottles and other vessels, and for the storage of empty boxes and other articles of like character. It follows from this conclusion that the complainant, by force of the devise made to him by Dr. Thomas, is now entitled to those rights, and to be protected in their use and enjoyment, unless he has by his own conduct placed himself in a position where it is a fraud for him now to assert them against the defendants.

The defendants insist that they are entitled to a judgment that the complainant is estopped. The facts on which this defence rests are vouched for by the oath of but a single witness. The defendant William Lyon testifies that shortly before making the contract of purchase, he informed the complainant that he intended to purchase and asked him what part of the premises he claimed the right to use, and that the complainant replied he claimed the store, the cellar under the store and the office in the rear; that he then inquired if that was all, and that the complainant answered "Yes." The defendant says when he made these inquiries, the question whether the complainant had any rights in the yard was before his mind, but he does not know whether it was before the mind of the complainant or not, and that the reason he did not ask him directly whether he claimed any rights in the yard or not, was because his statement as to what he claimed corresponded, except as to the office, with what Lemuel Thomas had told him the complainant was entitled to, and also because Lemuel Thomas had previously informed him

the complainant had no rights in the yard. The reasons he
gives for not making inquiries respecting the yard seem to me to
be both unnatural and insufficient, and to indicate that his ques-
tions were framed rather with a view of getting as much infor-
mation as might be useful than with a desire to learn the whole
truth. He had heard Lemuel Thomas's statement as to what
the complainant's rights were; he was not satisfied with it, and
thought it prudent to get from the complainant himself a speci-
fication of his claim. Lemuel Thomas had told him the com-
plainant had no right to the office and no rights in the yard.
His object in applying to the complainant was, to ascertain if
this was true, and now he has found it was not true as to the
office. What would this discovery naturally have prompted him
to do if he was engaged in an honest search after information on
which he expected to act? To be satisfied with an answer that
referred exclusively to the building, and did not embrace the
yard, or would an honest searcher after information have pressed
his inquiries further and desired to know whether what Lemuel
Thomas said about the yard was true or not? Besides, when
Mr. Lyon addressed his inquiry to the complainant, they were
in the store, and Mr. Lyon says his question was, "What part
of these premises do you claim the right to use?" No fur-
ther description of what his question referred to was given.
Did the complainant understand that his question embraced
the building and the yard, or the building only? His answer
indicated that he understood it as embracing the building alone.
But, in addition, Mr. Lyon knew that there was a door leading
from the rear of the store into the yard; what did he suppose
that was there for? He admits the yard was before his mind,
he was thinking of it; he did not know how the complainant
understood the words "these premises," but his answer indicated
that he understood them as comprehending the building only,
and yet Mr. Lyon does not call the complainant's attention to
what was before his mind, nor give the complainant a fair op-
portunity, by putting a plain question to him, to tell what rights
he claimed in the yard. A party, who, by the obscurity or am-
biguity of his inquiries, leads another to make an erroneous

statement respecting his rights, or by his artful silence entraps another into an admission he would not have made if a fair opportunity had been afforded him to declare the truth, is in no position to set up an equitable estoppel. If he has been misled, it is the result of his own carelessness or fraud, and in either case he is the party most in fault, and justice therefore demands that he should bear its consequences.

But if the facts sworn to by Mr. Lyon were of a different character, and sufficient, if believed, to establish this defence, still, I think the court would be bound to declare it had failed in this case for the want of the requisite degree of proof to sustain it. On this issue the burden is with the defendants; to succeed, the proofs must preponderate in their favor. The complainant swears that no such conversation as that sworn to by Mr. Lyon ever took place, that Mr. Lyon did not have a talk with him while he was negotiating the purchase, and that the purchase was completed and the contract signed before he ever heard of Mr. Lyon in connection with the property. His evidence on this point is very strongly corroborated by the fact that Mr. Lyon, during the discussions which were had between them respecting the complainant's rights in the yard, never referred to the conversation he now says took place, nor intimated that he had purchased on the faith of a representation by the complainant that his rights in the premises were limited to the store, cellar and office. If the complainant had made a disclaimer of any rights in the yard, or used language which Mr. Lyon understood as a disclaimer, it seems almost incredible that when the complainant subsequently asserted rights utterly inconsistent with his previous statement, that Mr. Lyon did not at once accuse him of bad faith. If he had been at all influenced in his purchase by such representation, an angry accusation of bad faith would have broken from his lips almost against his will, but he never intimated or pretended that he had been misled or deceived. This defence fails.

The complainant is entitled to relief. The only remaining question is, in what form and by what process it shall be given. The complainant insists that he is entitled to a mandatory injunction, commanding the defendants to remove and abate their

Stanford v. Lyon.

building, and also to have the damages which he has sustained in consequence of being deprived of his rights in the yard, ascertained by this court or under its direction, and a decree for their payment. The latter claim, it is very clear, cannot be entertained. It is a claim for damages arising out of a tort—for damages pure and simple. Claims of this character, it has been decided by the court of errors and appeals, cannot be admeasured under the authority of the chancellor. *Palys* v. *Jewett, 5 Stew. Eq. 302.*

The principal object of the action in *Iszard* v. *Mays Landing Water Power Co., 4 Stew. Eq. 511,* was to compel the defendants to remove and abate a solid stone wall, which they had erected to cut the complainant off from water which he claimed they had agreed to furnish his mill. It was an action for specific performance, and the complainant asked by his bill, as incidental to the main relief he sought, to have the damages, which he had sustained in consequence of being deprived of the water, ascertained by the chancellor or under his direction. The chancellor decreed that the defendants should specifically perform their contract, and by a mandatory injunction commanded them to remove and abate the stone wall, but declined to take jurisdiction of the question of damages, remarking that although "this court has, in a suit for specific performance, jurisdiction to award compensation for any deficiency in the title, quantity, quality, description or other matters touching the estate, it has not jurisdiction to award damages for the breach of a contract, except as ancillary to specific performance, or some other relief." This adjudication is directly in point and must be accepted as decisive.

The power of this court to award a mandatory injunction is no longer open to question. Such writs have, in several instances, been awarded to carry into effect the decrees of the court of errors and appeals. *Raritan and Delaware Bay R. R. Co.* v. *Delaware and Raritan Canal Co. &c., 3 C. E. Gr. 546, 574; Carlisle* v. *Cooper, 6 C. E. Gr. 576; Johnston* v. *Hyde, 6 Stew. Eq. 632, 640.* In the case first referred to, a mandatory injunction was ordered as a precautionary measure against an injury that might possibly arise in the future. The complainants were given the writ by

the decree, as an established right, to be used or not in the future, as the future exigencies of the situation might render necessary.

The courts, in deciding whether a mandatory injunction shall issue or not, always proceed with caution, and will, as a general rule, only allow the writ to go in cases where it appears to be the only appropriate and effectual remedy for the grievance. But in a case like that under consideration, where the complainant's legal right is entirely clear, and where the injury of which he complains is not only a constantly recurring grievance, but is an actual, permanent appropriation by the defendant of the complainant's property, so that the court, under its own established rules, is left no choice but is bound to take jurisdiction, there, on pronouncing decree, a mandatory injunction goes, as of course, as the necessary and appropriate process for the enforcement of the decree. *Johnston* v. *Hyde, 6 Stew. Eq. 632, 640.* No other process will meet the justice of this case or give the complainant an effectual remedy. To dismiss him from this court and send him to the law courts, would be, in effect, condemning him to endless litigation—for the only redress they can give for a continuing injury is by successive suits—or compelling him to submit to the confiscation of his rights. There is nothing in the conduct of the defendants which should induce the court to stint the complainant in his relief, or to deny to him the full benefit of the usual remedy for his wrong. They had full notice of his rights before they began the construction of their building. He attempted to prevent its construction by suit; they persisted in completing the building with the threat of that suit hanging over them, and accepted the hazard of doing so while their right was in contest and undetermined. If the remedy which must be applied to right their wrong seems harsh, it should be remembered that the remedy is such as their rash obstinacy has made necessary.

The complainant is entitled to a mandatory injunction, commanding the defendants to remove and abate so much and such parts of their building as prevents and precludes him from exercising his rights in the yard. He will also be entitled to his costs of this suit.